

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00079-CV

_____

EDEN II ENTERPRISES, LLC D/B/A CONCHO HEALTH &
REHABILITATION CENTER AND CREATIVE SOLUTIONS IN HEALTHCARE,
INC., Appellants

V.

BOBBIE CHARLTON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF
PEARL TRAPINI, Appellee

---

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-324884-21

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an interlocutory appeal from an order denying the joint motion to dismiss filed by Appellants Eden II Enterprises, LLC d/b/a Concho Health & Rehabilitation Center and Creative Solutions in Healthcare, Inc. pursuant to Texas Civil Practice and Remedies Code Section 148.003, which deals with liability for causing exposure to a pandemic disease. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 51.014(a)(16), 148.003(f). Assuming without deciding that Section 148.003 applies to the exposure claims alleged by Appellee Bobbie Charlton, Individually and on Behalf of the Estate of Pearl Trapini, we conclude that Appellants failed to timely file an objection under Section 148.003(d) to the sufficiency of the expert report. *See id.* § 148.003(d). We therefore affirm.

## II. Factual Background

The facts of this case are straightforward. Pearl Trapini was admitted to Eden II Enterprises, LLC d/b/a Concho Health & Rehabilitation Center[1] in July 2020,[2] "for rehabilitation to get stronger." At her admission, Pearl had the following comorbidities: "fall risk, no spleen, and muscle weakness." Concho knew that Pearl

---

[1]According to Charlton's petition, Concho was managed by Creative Solutions in Healthcare, Inc.

[2]The dates listed in Charlton's petition differ from those in Charlton's expert report. The dates reflected in the factual background are taken from the expert report.

had these comorbidities, knew of the increased risks associated with these conditions, and represented to Charlton that it was able, knowledgeable, and sufficiently staffed to adequately care for Pearl's needs.

While Pearl was a resident of Concho, she was moved into a room with a patient who had previously been placed in the COVID-19 unit. On or about November 16, 2020, Pearl tested positive for COVID-19. She was administered Methadone, and her condition worsened. On or about November 28, 2020,[3] she was transferred to Shannon Hospital. On December 7, 2020, Pearl passed away. The causes of death listed on Pearl's death certificate were metabolic encephalopathy, acute respiratory failure, and COVID-19 pneumonia.

### III. Procedural Background

Because the outcome of this case is dependent on the timeliness of an objection (or lack thereof), we set forth the time line of the relevant events[4] in bulleted format for ease of reading:

- On April 26, 2021, Charlton filed suit against Appellants[5] alleging causes of action for medical negligence, corporate negligence, and gross negligence.

[3]The expert report states that Pearl was transferred on "11/28/2019," but the sentences prior to that use 2020. Because the date of transfer listed in the expert report appears to be a clerical error, we use 2020 for the date of transfer.

[4]We omit Appellants' motions to exclude expert testimony, Charlton's response, and the trial court's ruling, as well as Charlton's motion to modify discovery deadlines and designate a new expert, Appellants' amended objections and response to Charlton's motion, and the parties' letters related to the motion.

[5]Charlton's petition alleged that Appellants are licensed health care providers.

Some of Charlton's exposure claims included that Appellants had breached the standard of care to Pearl by failing to institute and implement an infection-control program, neglecting her to such a degree that she was exposed to COVID-19, failing to enforce social distancing among residents, failing to cancel all group activities and communal dining, failing to timely restrict all visitors, and failing to adequately screen everyone entering the building for symptoms of COVID-19.

- On June 1, 2021, each Appellant filed an answer, asserting a general denial and various affirmative defenses. Among the affirmative defenses, they invoked "the limitations of liability contained in Chapter 74 . . . of the Texas Civil Practice and Remedies Code."[6]

- On June 14, 2021, two new sections of the Texas Civil Practice and Remedies Code—Section 74.155 and Section 148.003—took effect.[7] The two sections provide defenses to liability for certain claims that arise during a pandemic.[8]

- On September 3, 2021, Charlton served on Appellants the expert report of Dr. Christopher Davey.

---

[6]Texas Civil Practice and Remedies Code Subchapter G, entitled "Liability Limits," sets forth the Chapter 74 limitations on liability for health care liability claims. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.301–.303.

[7]*See* Act of May 28, 2021, 87th Leg., R.S., ch. 528, § 2, 2021 Tex. Gen. Laws 1058, 1058–59 (codified at Tex. Civ. Prac. & Rem. Code § 74.155); Act of May 28, 2021, 87th Leg., R.S., ch. 528, § 3, 2021 Tex. Gen. Laws 1058, 1061–62 (codified at Tex. Civ. Prac. & Rem. Code § 148.003).

[8]Appellants did not object to the expert report based on Section 74.155 or move for dismissal on that basis, and thus the report's compliance with that section is not before us. We mention that section only to the extent that it was also passed as part of the Pandemic Liability Protection Act (PLPA) that added Section 148.003 and to show the possible defenses that the Act created to pandemic liability. Because we assume without deciding that Section 148.003 applies to the exposure claims alleged by Charlton, we need not decide how the doctrine of *in pari materia* impacts the construction of the two statutes. *See* Tex. R. App. P. 47.1. *See generally* Tex. Gov't Code Ann. § 311.026 (codifying the *in pari materia* doctrine in the Code Construction Act).

- On April 7, 2022 (216 days after the expert report was served), each Appellant filed a first amended original answer, reasserting a general denial and various affirmative defenses. As a new affirmative defense, they pleaded "the limitations afforded to [them] under Tex. Civ. Prac. & Rem. Code § 148.003."

- Six months later, Appellants filed a joint motion to dismiss pursuant to Section 148.003, and that motion forms the basis of this appeal. Appellants argued that Charlton had failed to comply with Section 148.003 by not providing an expert report with the factual and scientific basis of the assertion that Appellants' failure to act had caused Pearl to contract a pandemic disease. Appellants contended in their motion that both Sections 74.155 and 148.003 could apply to a medical malpractice case if the plaintiff alleges both exposure to COVID-19 and improper treatment or failure to treat a plaintiff who is already infected or is suspected of being infected with COVID-19. Appellants argued that Section 148.003 is directly applicable to this case because it involves Pearl's exposure to COVID-19. Appellants further argued that because no Section 148.003 expert report had been served on them and because more than 120 days had elapsed, the case should be dismissed.

- Charlton filed a response, arguing that Appellants know that Chapter 74 applies to this case because they invoked in their original and in their amended answers the limitations of liability contained in Chapter 74. Charlton further argued that the rules under Chapter 74 apply and trump any conflict with Section 148.003 because Section 74.002 states that "this chapter controls to the extent of the conflict." *See id.* § 74.002. Moreover, Charlton contended that she had "made clear throughout the lawsuit that the care and treatment of [Pearl], not just 'pandemic exposure,' was at issue." Charlton stated that she had put Appellants "on notice of specific conduct that included treatment of COVID-19 and specified 'failure to transfer' in her September 3, 2021 expert report" and that at that point, Appellants "had 60 days to assert a [Section] 74.155 defense by providing [Charlton] with specific facts that supported said defense." *See id.* § 74.155(g)(1).

- Appellants filed a reply, reasserting that Charlton's Chapter 74 expert report did not comply with the requirements of Section 148.003 and that the case must therefore be dismissed. Appellants asserted that there is no conflict between Chapter 74 and Section 148.003 and that the Texas Legislature

provided "[d]efendants with additional protections from liability in regard to the exposure of an individual to COVID-19."

During the hearing on the motion, Charlton's counsel specifically argued that if Appellants

> were going to challenge [the] report, and if they were going to claim [Section] 148.003[] and that the report was deficient[,] then they had 120 [sic] days to challenge that. That's why all of these motions this late in the game . . . are concerning. . . . I just wanted to state that if they were going to challenge the Chapter 74 report under [Section] 148.003[,] then . . . they had to do that within 120 [sic] days after it was served[,] which they never challenged the Chapter 74 report in this case, not ever.

After hearing arguments from counsel, the trial court took the matter under advisement. Before rendering its order, the trial court sent the parties a letter informing them that the motion was denied and conveying that the denial was "not due to the inapplicability of § 148.003" and that it "was swayed by [Charlton's] argument of substantial compliance." The trial court thereafter signed an order denying Appellants' motion to dismiss pursuant to Section 148.003.

This interlocutory appeal followed.

## IV. No Section 148.003(d) Objection Was Ever Filed

In their sole issue, Appellants argue that the trial court correctly found that Section 148.003 of the Texas Civil Practice and Remedies Code applies to this case but erroneously held that Charlton's Chapter 74 report substantially complied with Section 148.003's expert-report requirements. Assuming without deciding that

6

Section 148.003 applies,[9] Appellants failed to object to the expert report within the time frame set by Section 148.003. Thus, we uphold the trial court's ruling but for a different reason than the one it gave in its pre-ruling letter.

## A.     Standard of Review

This court has previously set forth the standard we use to review a trial court's ruling on a motion to dismiss pursuant to Texas Civil Practice and Remedies Code Section 74.351(b)—the section governing expert reports that are required when a health care liability claim is alleged:

> A trial court's ruling on a motion to dismiss pursuant to Section 74.351(b) is subject to review for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Jackson v. Kindred Hosps. Ltd. P'ship*, 565 S.W.3d 75, 80 (Tex. App.—Fort Worth 2018, pet. denied). "Under an abuse[-]of[-]discretion standard, the appellate court defers to the trial court's factual determinations if they are supported by evidence[] but reviews the trial court's legal determinations de novo." *Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). In applying this standard, an appellate court may not substitute its own judgment for that of the trial court[] or otherwise find an abuse of discretion merely because it would have ruled differently on the same. *See id.* To that end, if the trial court did not file findings of fact or conclusions of law, the reviewing court may "uphold the trial court's ruling on any theory supported by the record and imply any findings of fact necessary to support its ruling." *Rinkle v. Graf*, 658 S.W.3d 821, 824 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

---

[9] *Cf. Layne v. Esplanade Gardens Senior, Inc.*, No. SA-21-CV-00558-XR, 2022 WL 14225362, at *3 (W.D. Tex. Oct. 24, 2022) (order on motion to dismiss) (acknowledging the possibility that both Section 148.003 and Section 74.155 might apply in the context of nursing-home lawsuits).

*CSL S Weatherford, LLC v. Arens*, 668 S.W.3d 431, 437 (Tex. App.—Fort Worth 2023, pet. denied). Because Section 148.003 is a fairly new statute, because it does not currently have any state-law cases that cite it, and because it also provides for dismissal on a defendant's motion if the expert report is not timely served, we apply the same abuse-of-discretion standard here. *Cf. FAI Eng'rs, Inc. v. Logan*, No. 02-20-00255-CV, 2020 WL 7252315, at *3 (Tex. App.—Fort Worth Dec. 10, 2020, no pet.) (mem. op.) (applying abuse-of-discretion standard to interlocutory appeal from an order denying a motion to dismiss pursuant to Texas Civil Practice and Remedies Code Chapter 150).

## B. The Statutes at Issue

When dealing with claims related to a pandemic disease, the Texas Legislature has created a statutory scheme under which there are potentially multiple expert-report requirements and affirmative defenses. We therefore set forth the statutes that are potentially applicable to the claims raised below.

### 1. Texas Civil Practice and Remedies Code Section 148.003

Section 148.003 sets forth liability for causing exposure to a pandemic disease:

(a) A person is not liable for injury or death caused by exposing an individual to a pandemic disease during a pandemic emergency unless the claimant establishes that:

(1) the person who exposed the individual:

(A) knowingly failed to warn the individual of or remediate a condition that the person knew was likely to result in the

exposure of an individual to the disease, provided that the person:

> (i) had control over the condition;

> (ii) knew that the individual was more likely than not to come into contact with the condition; and

> (iii) had a reasonable opportunity and ability to remediate the condition or warn the individual of the condition before the individual came into contact with the condition; or

(B) knowingly failed to implement or comply with government-promulgated standards, guidance, or protocols intended to lower the likelihood of exposure to the disease that were applicable to the person or the person's business, provided that:

> (i) the person had a reasonable opportunity and ability to implement or comply with the standards, guidance, or protocols;

> (ii) the person refused to implement or comply with or acted with flagrant disregard of the standards, guidance, or protocols; and

> (iii) the government-promulgated standards, guidance, or protocols that the person failed to implement or comply with did not, on the date that the individual was exposed to the disease, conflict with government-promulgated standards, guidance, or protocols that the person implemented or complied with; and

(2) reliable scientific evidence shows that the failure to warn the individual of the condition, remediate the condition, or implement or comply with the government-promulgated standards, guidance, or protocols was the cause in fact of the individual contracting the disease.

Tex. Civ. Prac. & Rem. Code Ann. § 148.003(a). Unless extended by written agreement of the affected parties, not later than the 120th day after the date a defendant files an answer to a claim to which Subsection (a) applies, the claimant shall serve on the defendant (1) a report authored by at least one qualified expert that provides a factual and scientific basis for the assertion that the defendant's failure to act caused the individual to contract a pandemic disease and (2) a curriculum vitae for each expert whose opinion is included in the report. *Id.* § 148.003(b), (c). Then, the defendant must file an objection to the sufficiency of the report and serve the objection on the claimant not later than twenty-one days after the later of (1) the date the report is served on the defendant or (2) the date the defendant's answer to the claim is filed. *Id.* § 148.003(d). If a court determines that a report served under Subsection (b) does not represent an objective, good-faith effort to provide a factual and scientific basis for the assertion that the defendant's failure to act caused the injured individual to contract a pandemic disease, the court may grant the claimant, on one occasion, a thirty-day period to cure any deficiency in the report. *Id.* § 148.003(e). If a sufficient report is not timely served, the court, on the defendant's motion, shall dismiss the claim with prejudice. *Id.* § 148.003(f).

### 2. Texas Civil Practice and Remedies Code Section 74.351

The general statute governing expert reports for health care liability claims defines an expert report as

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). Such report generally must be served not later than the 120th day after the date each defendant's original answer is filed, and each defendant health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived. *See id.* § 74.351(a).

### 3. Texas Civil Practice and Remedies Code Section 74.155

A defendant health care provider who is sued as a result of action or inaction during a pandemic may assert a defense under Section 74.155(b):

Except in a case of reckless conduct or intentional, wil[*l*]ful, or wanton misconduct, a physician, health care provider, or first responder is not liable for an injury, including economic and noneconomic damages, or death arising from care, treatment, or failure to provide care or treatment relating to or impacted by a pandemic disease or a disaster declaration related to a pandemic disease if the physician, health care provider, or first responder proves by a preponderance of the evidence that[]

(1) a pandemic disease or disaster declaration related to a pandemic disease was a producing cause of the care, treatment, or failure to provide care or treatment that allegedly caused the injury or death; or

(2) the individual who suffered injury or death was diagnosed or reasonably suspected to be infected with a pandemic disease at the time of the care, treatment, or failure to provide care or treatment.

11

*Id.* § 74.155(b). Subsection (d) defines "[c]are, treatment, or failure to provide care or treatment" relating to or impacted by a pandemic disease and—with the exception of the conduct described in (9) below—includes mostly actions that do not appear to constitute exposure:

(1) screening, assessing, diagnosing, or treating an individual who is infected or suspected of being infected with a pandemic disease;

(2) prescribing, administering, or dispensing a drug or medicine for off-label or investigational use to treat an individual who is infected or suspected of being infected with a pandemic disease;

(3) diagnosing or treating an individual who is infected or suspected of being infected with a pandemic disease outside the normal area of the physician's or provider's specialty, if any;

(4) delaying or canceling nonurgent or elective medical, surgical, or dental procedures;

(5) delaying, canceling, or not accepting in-person appointments for office or clinical visits, diagnostic tests, scheduled treatment, physical or occupational therapy, or any other diagnosis or treatment of an illness or condition not related to a pandemic disease;

(6) using medical devices, equipment, or supplies outside of their normal use, including using or modifying such devices, equipment, or supplies for an unapproved use, to treat an individual who is infected or suspected of being infected with a pandemic disease;

(7) conducting tests on or providing treatment to an individual who is infected or suspected of being infected with a pandemic disease outside the premises of a health care facility;

(8) acts or omissions caused by a lack of personnel or staffing, facilities, medical devices, supplies, or other resources attributable to a pandemic disease that renders a physician, health care provider, or first responder unable to provide the same level or manner of care to any individual that otherwise would have been acquired in the absence of the disease; and

(9) acts or omissions arising from the use or nonuse of personal protective equipment.

*Id.* § 74.155(d). A health care provider who intends to raise a defense under Subsection (b) must provide to a claimant specific facts that support an assertion under Subsection (b)(1) or (2) not later than the later of (1) the 60th day after the date the claimant serves an expert report on the physician, health care provider, or first responder under Section 74.351 or (2) the 120th day after the date the health care provider files an original answer in the suit. *Id.* § 74.155(g).

## C.     The Expert Report

Dr. Davey's report states at the outset that it is "a Chapter 74.351 report . . . [and] is not to be used for any other purposes" and that it "constitute[s] a good-faith effort to satisfy the[] requirements" of Section 74.351. Despite such wording, the report goes on to explain the various ways that Appellants breached the standard of care that was owed to Pearl as to her claims that Appellants exposed her to COVID-19:

> The standard of care for skilled nursing facilities is to take measures to prevent the spread of infectious communicable diseases. Further, the standard of care for skilled nursing facilities includes following recommendations issued by the Centers for Disease Control. In the present case, the standard of care was breached as [Pearl] developed a communicable disease, COVID-19. The Centers for Disease Control issued guideline for the mitigation of COVID-19 in March of 2020. Concho Health and Rehab and the staff of Concho Health and Rehab breached the standard of care when they failed to follow the CDC guideline issued in March of 2020. The breach of the standard of care occurred when Concho Health and Rehab's nursing staff failed to take appropriate measures to properly implement a nursing care plan related to the risk of COVID-19 infection upon [Pearl's] admission [in July 2020]. In the present case, Concho Health and Rehab's staff breached

13

the standard of care by failing to include a care plan related to the risk of COVID-19 in [Pearl's July 2020] care plan.

Additionally, the standard of care requires all skilled nursing facilities to implement effective infection[-]control policies and procedures specific to mitigation of infection risk from COVID-19. CMS[10] cited Concho Health and Rehab in November of 2019 for failure to "provide and implement" an infection[-]control program.[] The CMS report states [that] "the facility failed to maintain an infection[-] and prevention[-]control program to help prevent the development and transmission of communicable disease and infection." A[n] infection[-]prevention program would have included disinfecting surfaces, ensuring that residents and staff of Concho Health and Rehab were properly wearing personal protective equipment, and ensuring proper screening of entrants into the skilled[-]nursing facility. COVID-19 infection is spread through respiratory droplets released when someone with the virus coughs, sneezes, breathes, and talks. These droplets can be inhaled by a person in close proximity to an infected person. The virus would then colonize [in] the nasopharynx and enter the lungs, causing infection. Screening for infection includes [the] taking of vital signs and monitoring residents, which includes monitoring vital signs and monitoring [Pearl] for signs of a change in condition, such as lethargy or a decline in overall condition. By failing to follow an infection[-]control policy, Concho Health and Rehab and it[s] nursing staff and administration were permitting persons infected with COVID-19 to introduce the COVID-19 virus to [Pearl] who, more likely than not, came into contact with an infected resident or staff member, allowing the virus to enter her system and multiply, causing infection in the lungs. This caused a COVID infection in [Pearl] that caused her death.

. . . .

It is my opinion that the events and failures set forth in this report proximately caused [Pearl's] COVID infection and led to her pain, suffering, decline in health status, and death.

---

[10]Dr. Davey stated in his report that he had reviewed the "CMS Inspection of Concho Health and Rehab dated 11/07/2019," but he did not further explain or identify what CMS is.

Concho Health and Rehab's failure to properly develop infection protocols in accordance with the standards set forth by the Centers for Medicare and Medicaid Services caused COVID-19 to spread within Concho Health and Rehab. The failure of Concho Health and Rehab to properly maintain an[] infection[-] and prevention[-]control program caused residents and staff at Concho Health and Rehab to inhale droplets infected with the COVID-19 virus. Nursing staff at Concho Health and Rehab's failure to properly develop a care plan for [Pearl] related to the risk of COVID-19 caused [Pearl] to be exposed to droplets containing the COVID-19 virus. The failure to limit exposure to droplets containing the COVID-19 virus (by care planning and utilizing face masks for residents and staff) caused droplets from the speech and respirations of COVID-19 infected nursing staff at Concho Health and Rehab to be introduced into [Pearl's] room. The presence of droplets infected with the COVID-19 virus in [Pearl's] room caused [her] to inhale the infected droplets in her respiratory system. The inhalation of droplets infected with COVID-19 exposed [Pearl] to the COVID-19 virus. The exposure to COVID-19 created an increased risk of COVID-19 infection for [Pearl]. [Pearl's] increased risk of COVID-19 infection caused [her] to contract COVID-19. [Pearl's] COVID-19 infection caused pain, suffering, and death.

. . . .

Due to [Appellants'] failures above stated, [Pearl] suffered COVID-19 and death.

It is my opinion that the events and failures set forth in this report proximately caused [Pearl's] infections and led to h[er] pain, suffering[,] and death related to COVID-19.

## D.    Analysis

Appellants argue that because Dr. Davey's report states that it is "'a Chapter 74.351 report . . . [and] is not to be used for any other purposes[,]' . . . it is clear from the face of the report that he was not attempting to comply with the expert[-]report requirements under Section 148.003." Nowhere in Section 148.003 does it require the

15

report to state that it was made in accordance with or under Section 148.003, nor does it require the report to be separate from a Section 74.351 report. We decline Appellants' invitation to elevate form over substance. *See Thailing v. Matthews ex rel. Matthews*, No. 2-09-031-CV, 2009 WL 3246736, at *1 (Tex. App.—Fort Worth Oct. 8, 2009, no pet.) (mem. op.); *cf. Thota v. Young*, 366 S.W.3d 678, 690 (Tex. 2012) ("[W]e have long favored a common[-]sense application of our procedural rules that serves the purpose of the rules, rather than a technical application that rigidly promotes form over substance.").

Appellants also argue that the report is so deficient that it constitutes no report under Section 148.003, and thus the time for them to object to the report under Section 148.003 has not even begun to run.[11] Appellants' brief goes through the report and compares it to Section 148.003(a)'s requirements, which describe what a claimant must prove at trial. But Section 148.003(b)(1) is the subsection that establishes what the expert report must contain—a factual and scientific basis for the assertion that the defendants' failure to act caused the individual to contract a pandemic disease. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003(b)(1). Having reviewed the report, we conclude that although it references Section 74.351, it constitutes an objective, good-faith effort to provide a factual and scientific basis for

[11]The specific argument that Appellants raised in their brief is that Charlton's "contention that Appellants had twenty-one (21) days to object to the failure of Dr. Davey's report under Section 148.003 is meritless because they did not serve any report pursuant to Section 148.003 and Dr. Davey's Chapter 74 report constituted 'no report' under Section 148.003."

16

Charlton's assertion that Appellants' failure to act caused Pearl to contract a pandemic disease. The report sets forth the standard of care, Appellants' breaches of the standard of care, and the causal link between those breaches and Pearl's contracting COVID-19. *Cf. Roe v. Tajon*, No. 02-23-00179-CV, 2023 WL 8643020, at *7 (Tex. App.—Fort Worth Dec. 14, 2023, no pet.) (mem. op.) (concluding under Section 74.351 that the expert report adequately informed the hospital of the specific conduct that the estate had called into question and that the report represented an objective, good-faith effort to provide "a fair summary of the expert's opinions . . . regarding applicable standards of care[ and] the manner in which the care rendered by the physician or health care provider failed to meet the standards"). *See generally E.D. ex rel. B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (stating that the threshold requirement of an adequate expert report strikes "a careful balance between eradicating frivolous claims and preserving meritorious ones"). We therefore conclude, as the trial court did, that Dr. Davey's report constitutes an objective, good-faith effort to meet the requirements set forth in Section 148.003(b)(1).

Because the report substantially complies with the requirements set forth in Section 148.003, Appellants were required to file an objection within the time limit specified by Section 148.003(d). Appellants filed no such objection. Thus, Appellants argue for the application of Section 148.003 to dispose of Charlton's exposure claims without having followed the statute's prerequisites to obtain the relief provided by the statute. Failure to follow the statute results in failure to obtain the statute's

17

protection. Appellants therefore are not entitled to dismissal under Section 148.003(f), and we hold that the trial court did not abuse its discretion by denying their motion to dismiss pursuant to Section 148.003. Accordingly, we overrule Appellants' sole issue.

## V. Conclusion

Having overruled Appellants' sole issue, we affirm the trial court's order denying Appellants' motion to dismiss pursuant to Section 148.003.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: June 13, 2024

18